# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRENDALYN KING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:25-CV-3293 |
| | ) | |
| MIDLAND CREDIT MANAGEMENT, | ) | |
| INC.; MIDLAND FUNDING, LLC; | ) | |
| ENCORE CAPITAL GROUP, INC., | ) | |
| | ) | |
| Defendants. | ) | |

The deposition of BRENDALYN KING, called for examination by the Defendants, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before KELLY A. BRICHETTO, CSR No. 84-3252, Certified Shorthand Reporter of the State of Illinois, taken at Suite 4100, 111 South Wacker Drive, Chicago, Illinois, on the 30th day of March, 2026, at 10 a.m. Central Standard Time.

APPEARANCES:

On behalf of the Plaintiff:

MS. BRENDALYN KING, pro se

On behalf of the Defendants:

TROUTMAN PEPPER LOCKE, LLP, by
MR. LOUIS J. MANETTI, JR.
111 South Wacker Drive
Suite 4100
Chicago, Illinois 60606
(312) 443-1726
Louis.manetti@troutman.com

\- - - - - - -

TRANSCRIPT INDEX

APPEARANCES . . . . . . . . . . . . . . . . . . . . . 2

INDEX OF EXHIBITS . . . . . . . . . . . . . . . . . . 4

EXAMINATION OF BRENDALYN KING
BY MR. MANETTI . . . . . . . . . . . . . . . . . . .  5

REPORTER'S CERTIFICATE . . . . . . . . . . . . . . . 76

EXHIBIT CUSTODY
COURT REPORTER

## INDEX OF EXHIBITS


| NUMBER | DESCRIPTION | IDENTIFIED |
|---|---|---|
| Exhibit No. 1 | Notice of intent to sue letter | 20 |
| Exhibit No. 2 | Validation and cease and desist letter | 20 |
| Exhibit No. 3 | Bates MCM 7 | 21 |
| Exhibit No. 4 | Bates MCM 4 | 22 |
| Exhibit No. 5 | Complaint | 22 |
| Exhibit No. 6 | Summary level document | 50 |
| Exhibit No. 7 | Bates MCM 9-12 | 59 |
| Exhibit No. 8 | Bates MCM 13-24 | 62 |
| Exhibit No. 9 | Bates MCM 25 | 63 |
| Exhibit No. 10 | First Amended Complaint | 66 |
| Exhibit No. 11 | Responses to Midland Credit's Interrogatories | 13 |

(Witness sworn.)

THE WITNESS: I'd like to make a statement.

MR. MANETTI: One second.

Let the record reflect that this is the deposition of Brendalyn King in case 25-CV-34293 taken pursuant to the Federal Rules of Civil Procedure and local rules.

WHEREUPON:

BRENDALYN KING,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MANETTI:

Q. Ms. King, is this your first deposition?

A. Yes, it is.

Q. Okay. A deposition is -- this is part of what I want to go over initially. A deposition is a series of questions and answers. I'll ask you questions. You'll answer. There are other formats in which you can make statements if that is what you want to do but this isn't really one of them.

So first off, are those notes in your hand or a statement you want to read? Do you want me to see those?

A. No, but I'd like to make a statement.
Q. I understand that, but that's not really what this is for.
So, Ms. King, would you please state your full name for the record.
A. Brendalyn King.
Q. Middle name?
A. Joyce.
Q. Have you ever taken -- you've never taken a deposition before; correct?
A. No.
Q. So as I said, here are some ground rules. They're always good to go over, but this is -- this will be helpful for you because this is your first deposition.
Please answer the questions verbally. Nods and head shakes and other physical answers the court reporter can't transcribe. Likewise, saying um-hum or na-huh, similar responses to that are difficult for the court reporter to transcribe, so please answer with a yes or no if that's appropriate.
Please wait until I finish my question before you give an answer if you know what I'm going to say and how you're going to answer. The court reporter can't write down the question and answer simultaneously.

If at any time you don't understand a question, let me know and I will rephrase to the best of my ability, but unless you tell me you didn't understand the question, I'm going to assume that you understood it as it was asked. Is that fair?

A. Yes.

Q. Okay. If you need a break, I don't foresee this going too long, but if you need a break, let me know. I just ask that if I've asked a question that hasn't been answered yet you answer the question then we'll take a break. Is that fair?

A. Yes.

Q. Okay.

A. But can I speak?

Q. Ms. King, this isn't really a forum for making statements. Depositions are questions and answers.

A. Okay. So I just need to say that I duly noted wanted to make reference to a record and I'm not able to. That's all.

Q. Okay. Ms. King, there's some questions I need to ask just to make sure that this is worth everyone's time today that the questions you're going to give are full and complete, there's nothing -- there's

nothing from preventing you from giving accurate answers as you sit here today. So have you taken any drugs or alcohol today?

A. No.

Q. Is there any reason you can't testify truthfully and give complete answers to the questions?

A. No.

Q. Is there any reason why you can't give full attention to this deposition today?

A. No.

Q. Tell me how you prepared for your deposition today.

A. I went over my notes.

Q. Okay. Just your notes?

A. Yes.

Q. Did you review any of the documents from this case, your original Complaint?

A. That's part of my notes.

Q. Okay. So the original Complaint, your Amended Complaint, your responses to discovery, to our discovery requests, did you go over those?

A. Yes.

Q. Did you go over our responses to your discovery requests?

A. Yes.
Q. Did you go over your motion to compel and amended motion to compel?
A. Yes.
Q. Did you discuss this case with anyone?
A. No.
Q. Are there any documents that you reviewed that I didn't -- that we didn't previously go over or haven't been turned over in discovery?
A. I can't verify that.
Q. What do you mean by that?
A. I can't verify that because I can't make the statement which I originally was going to make, so I can't verify that.
Q. I don't think it's connected to you being able to make a statement at the outset.
Did you go over any other documents other than the ones we talked about just now?
A. No.
Q. Okay. Ms. King, how old are you?
A. 75.
Q. What's your date of birth?
A. [redacted], 1950.
Q. What's your highest level of education?

A. High school.
Q. Completed high school?
A. Yes.
Q. What high school did you go to?
A. Hirsch High School.
Q. Where is that?
A. South side, Englewood.
Q. Have you ever been a party to a lawsuit?
A. No.
Q. You being the plaintiff in this case is the first lawsuit you've been a party to?
A. Yes.
Q. Where do you currently live?
A. 22411 Butterfield Road, Apartment 103, Richton Park, Illinois, 60471.
Q. Does anyone live there with you?
A. No.
Q. Do you own or rent?
A. Rent.
Q. How long have you lived there?
A. Since 2018.
Q. Where did you live before that?
A. Homewood, Illinois.
Q. Do you remember the address?

A. 18834 Loomis Avenue.
I object though. How is my old address relevant to this?
Q. I'm simply getting background information, Ms. King.
A. Okay.
Q. About how long did you live there?
A. About two years.
Q. Two years. From 2016 to 2018?
A. Approximately.
Q. Who is your current employer?
A. I'm retired.
Q. How long have you been retired?
A. 2007.
Q. Where did you work before you retired?
A. United States Postal Service.
Q. Approximately how long did you work for the Postal Service?
A. Fourteen years.
Q. Ms. King, did you take out a Macy's credit card around December 6, 2016?
A. I don't recall.
Q. Did you take out a Macy's credit card at any point?

A. I don't recall.
Q. Have you taken out any retail or associated credit cards in the past 15 years?
A. Yes.
Q. Which ones were they? What stores were they associated with?
A. I don't recall.
Q. Any of them?
A. I don't recall.
Q. Ms. King, you understand the account that's at issue in this case; correct?
A. Yes.
Q. Can you describe what that is?
A. You're referring to a lawsuit against Midland Credit, your clients; am I correct?
Q. More specifically I'm referring to the debt that is -- the debt that is the subject of this lawsuit, the one that you're disputing. Are you familiar with that account or debt?
A. I'm familiar with the lawsuit.
Q. Okay. Are you more specifically familiar with the account?
A. I don't understand the question.
Q. Okay. Your lawsuit alleges that the

defendants, Midland Credit, Midland Funding and Encore, contacted you regarding an account; is that right?
A. Yes.
Q. Okay. Are you familiar with the type of account that they're asserting or what that debt or account is?
A. Yes.
Q. Okay. Could you describe it for me?
A. A department store.
Q. Department store credit card; correct?
A. Yes.
Q. I want to show you -- Ms. King, what are you looking for in your bag?
A. I didn't know I couldn't look in my bag.
Q. No, what are you looking for?
Ms. King, I want to show you what's been marked Defendants' Exhibit 11. Do you recognize that?
(Witness peruses document.)
Ms. King, I'm not trying to trick you. That's a copy of your responses to Midland Credit's --
A. But I'd like to know for my --
Q. You can review it. You can peruse it to your level of satisfaction that that is what I say it is. You can read the whole thing.

A. Yes.
Q. That will -- obviously one takes shorter, one takes longer but just so you know.
A. Right, but I just feel better reading it for myself.
Q. Fair enough.
A. Okay.
(Witness peruses document.)
Q. Ms. King, what page are you on?
A. Pardon?
Q. What page are you on?
A. Going to 10.
Q. 10.
Let the record reflect it's 10:43 a.m.
(Witness peruses document.)
Ms. King --
A. Yes.
Q. -- I just want to ask you from what you just reviewed -- first of all, let the record reflect it's 11:05 a.m.
Ms. King, not the exhibits but just the responses themselves, do you recognize those responses?
A. Yes.
Q. These are your responses to Midland Credit

Management's First Set of Interrogatories; correct?
A. Yes.
Q. They were -- turn to Page 21. It says they were executed on February 13th, 2026. Am I reading that right?
A. You said Page 21?
Q. Yes.
A. And what is your question?
Q. They were executed on February 13th, 2026?
A. That is correct.
Q. And is that your signature next to the execution date?
A. Yes.
Q. Ms. King, why did it take you longer than 20 minutes to answer the question do you recognize this document?
A. I wanted to make sure that the document was correct and what I was reading.
Q. What do you mean by that?
A. I had to make sure that it was my document. I didn't know for certain until I read it.
Q. You had to read it word for word to know that it was your document?
A. Yes.

Q. Ms. King, if this is how we are going to proceed today and if there are going to be attempts to derail this deposition or waste time, I will take the appropriate action. Do you understand?

A. Yes.

Q. Ms. King, I want you to turn to Page 11. Are you there?

A. I am.

Q. Okay. Interrogatory 11 says: "Describe specifically every instance of reporting to the Federal Trade Commission that the account was the result of identity theft." Do you see that?

A. Yes.

Q. Your response is: "Plaintiff objects to this interrogatory to the extent it assumes facts not in evidence and presumes that plaintiff has alleged identity theft regarding the alleged account. Subject to and without waiving these objections plaintiff responds as follows: Plaintiff has not reported to Federal Trade Commission that the alleged account was the result of identity theft because plaintiff's claims are not based on identity theft." Do you see that, Ms. King?

A. Yes.

Q. So you're not alleging that this account was

the result of someone else taking it out in your name; correct?

A. Yes.

Q. Then how do you -- how do you explain this account in your name?

A. I don't have proof the account is in my name.

Q. Say again.

A. Where's proof that I have it in my name?

Q. You're saying -- listen to the question I'm asking. How do you explain this account in your name if you're not alleging identity theft?

A. Which account are you referring to?

Q. The National Department Stores credit card Macy's account.

A. I don't recall.

Q. I didn't ask if you recalled anything. I said how do you explain it.

A. I'm not understanding your question.

Q. In your interrogatory responses you're not claiming that this account was identity theft; right?

A. Right.

Q. How do you explain the existence of the account in your name if we're both clear that it's not identity theft?

A. Right. But are you saying I'm not saying I have an account or I never had an account?
Q. You're saying you don't recall if you ever had a Macy's National Department Store credit card?
A. I don't recall.
Q. Right. How do you explain the existence of this account if it wasn't by identity theft?
A. I don't recall.
Q. No. No. No. I'm not asking if you recall anything. This account exists.
A. Um-hum.
Q. It exists in your name; correct?
A. Do you have proof it is in my name?
Q. That's not the question. This account is in your name; yes?
A. Yes.
Q. How do you account for its existence if we're both clear that there was no identity theft?
A. I'm not saying it doesn't exist.
Q. Okay. Ms. King, what's your Social Security number?
A. [redacted]
Q. Go on.
A. You should have that already though; right?

Q. I want the information.
A. Last four, [redacted].
Q. What's the middle two?
A. So am I supposed to provide that for you or should you have that already?
Q. I'm asking you what's your Social Security number.
A. [redacted]
Q. Ms. King, what claims are you making against the defendants in this case?
A. They're already in my records.
Q. Describe them.
A. Overly abundant calls, stress, anxiety, alleged calls, alleged debts.
Q. Anything else?
A. Everything else is in the records.
Q. I'll take that exhibit back, please.
A. Um-hum.
Q. Thank you. Ms. King --
THE WITNESS: And at some point I would like to use the restroom not necessarily now but within the next five minutes just to make you aware.
MR. MANETTI: Absolutely. If you want to go now, you can go now.

THE WITNESS: Yeah, let me go now.
MR. MANETTI: Okay.
(WHEREUPON, a break was taken.)
BY MR. MANETTI:
Q. Ms. King, I'm going to show you what's been marked Defendants' Exhibit 1, November 21st, 2024 letter entitled "Notice of Intent to Sue." Is this a letter that you sent?
A. Yes.
Q. Did you send it on the day referenced in the letter, November 21st, 2024?
A. Yes.
Q. Did you communicate with any of the defendants in writing before this letter was sent?
A. No.
Q. So this is your first -- this was your first written communication to any of the defendants?
A. Yes.
Q. Okay. All right. Thank you. I'll take that back.
I'm going to show you, Ms. King, what's been marked Defendants' Exhibit 2, letter dated March 21st, 2025 entitled "Validation and Cease and Desist." It's

Bates marked MCM 1. For the record, Exhibit 1 was Bates marked MCM 5.

Ms. King, is this the letter that you sent to Midland Credit?

A. Yes.

Q. Were there any other letters between this letter and the prior letter that we just went over or is this the second letter you sent them?

A. There was no other letter.

Q. So this is --

A. Yes.

Q. There were no letters in between the November 21st letter and the March 21st, 2025 letter; correct?

A. Yes.

Q. Okay. Thank you, Ms. King. I'll take that back.

Ms. King, I'm showing you what's been marked Defendants' Exhibit 3. It's a letter entitled "Welcome. Your account has a new home" dated July 10th, 2021 from Midland Credit Management Bates marked MCM 7.

Ms. King, did you receive this document?

A. Yes.

Q. Did you receive it a few days after the date indicated on the letter?

A. I don't know.
Q. Did you do anything with respect to the account after receiving this letter?
A. No.
Q. All right. I'll take that back. Thank you, Ms. King.
I show you what's been marked Defendants' Exhibit 4, a letter from CitiBank NA dated July 1st, 2021 Bates marked MCM 4.
Ms. King, did you receive this document?
A. No.
Q. The address to you indicated in the letter is 18834 Loomis Avenue in Homewood, Illinois, 60430-4047; is that correct?
A. Yes.
Q. And that was a prior address of yours; correct?
A. Yes.
Q. Ms. King, I'm going to show you what's been marked Defendants' Exhibit 5. This is the file stamped copy of the Complaint in this matter, 2025-CV-3293. It's file stamped March 27th, 2025. Actually, let me see that for a second.
Before we look at this, can you describe the

calls that you are suing the defendants for?
A. Can you say that again, ask the question again?
Q. Sure. Sure. Can you describe the telephone calls that are the subject of your lawsuit, why you're suing the defendants?
A. I don't recall.
Q. You don't recall any of them off the top of your head?
A. It was so many of them. I don't recall every -- what do you want me to say about the call, to not call me again for an alleged debt. I remember speaking don't call me for an alleged debt.
Q. Let's go back to Defendants' Exhibit 5. Ms. King, please turn to Page 13. Are you there?
A. Yes.
Q. Okay. It's a signature block dated March 27, 2025; correct?
A. Yes.
Q. Underneath that signature is that your signature?
A. Yes.
Q. Okay. And you drafted this document?
A. Yes.

Q. Did you have any help?
A. No.
Q. Ms. King, I would like you to go to Page 3. Let me know when you're there.
A. I'm there.
Q. Okay. I'm at paragraph 18 at the bottom of the page. It says: "On May 2nd, 2024 at 11:43 a.m. CST talked with debt collector agent Mark -- named Mark Burgess." Can you describe the call from this date with any further detail?
A. I spoke with the agent and asked him not -- to stop calling me for an alleged debt, the same thing I told them before -- stop calling me for an alleged debt.
Q. Regarding this call that you allege on May 2nd, 2024, how do you know the caller was from Midland Credit?
A. My phone shows the call came from Midland Credit.
Q. Your cellular phone?
A. Yes.
Q. It didn't indicate any other -- so on the call screen on your phone along with the number it shows that's dialing you it said Midland Credit?
A. Yes.

Q. Did it say Encore?
A. I don't recall.
Q. Did it say Midland Funding?
A. I don't recall.
Q. Can you describe how this May 2nd, 2024 call was harassing?
A. They called me. It's a disturbance.
Q. Can you describe how this call was deceptive?
A. No.
Q. Can you describe any other reason you're suing the defendants because of this May 2nd, 2024 call as alleged in paragraph 18?
A. Repeat the question.
Q. Is there any other reason you're suing the defendants because of this May 2nd, 2024 call?
A. It's not about one call. It's about all the calls.
Q. I'm going to get to them as a group.
A. Okay.
Q. I want to make sure I have the details of each one right. Make sense? Okay.
Do you have any documentation of this May 2nd, 2024 call?
A. The call log that I provided to you.

Q. Okay. We'll get to that. I'd like you to go to the next page, Page 4. In paragraph 19 it alleges another call May 3rd, 2024 at 6:04 p.m. Do you see that?

A. Yes.

Q. Okay. Can you describe the call from this date?

A. It was a missed call.

Q. Any other description beyond what's in the Complaint?

A. No. They called my number.

Q. How did you know the caller was Midland Credit?

A. My history. I look up the numbers.

Q. So it wasn't because your phone said Midland Credit for this --

A. It says Midland Credit, but I can also verify my calls through my call history.

Q. How do you mean?

A. On my phone my call history tells me the numbers and it shows me who called. I could look that number up.

Q. How do you look it up?

A. Through my phone. My phone history give to me the information.

Q. Your phone automatically assigns the identity of the caller along with the number?

A. My phone tells me that I got a call from Midland Credit. I can verify my phone calls by the number and it says --

Q. Wouldn't it just give you the number though?

A. Pardon?

Q. Wouldn't it just give you the number though? The calling number, it would give you that. Wouldn't it only give you that?

A. It says Midland.

Q. Your phone -- your phone without you having to do anything?

A. I have to think through this.

Q. Sure.

A. I had a stroke before.

Q. Okay.

A. So I have to think through it. I received these calls from Midland Credit. I know they're calls from Midland Credit. They're on the phone. When I get someone, it says Midland Credit, and if I looked that number up on my phone and it's an 866 number, who is this from and I go back and it shows Midland Credit 1-866 yada yada yada.

Q. I'm just trying to drill down on this. Does your phone associate all 866 area code numbers with Midland?
A. I don't know. I know it has -- I know the calls that came from Midland. I can verify it. You have the call log that I provided to you.
Q. We'll get to that. So this was just something your phone did?
A. It provides me who called me.
Q. Okay. So, again, with this call your phone said it was Midland Credit and not Encore?
A. I asked and answered that.
Q. Not for this number. Not for this, I'm sorry, not for this date.
A. Which date are you referring to?
Q. May 3rd. We're talking about May 3rd, paragraph 19.
A. What is your question again?
Q. How did you know it was Midland Credit and not Encore or Midland Credit?
A. On May 3rd?
Q. Yes.
A. My phone verifies the number.
Q. Right. I think you're misunderstanding my

question. So was this call -- let me try and ask it this way: This May 3rd call that you allege in paragraph 19, was it from Encore?

A. It was from Midland.

Q. Okay. So not Encore?

A. No.

Q. Okay. Not Midland Funding?

A. No.

Q. Okay. Can you describe how this call, this May 3rd, 2024 call in paragraph 19 was harassing?

A. The call itself called me was harassing. When you intentionally call someone and you repeatedly ask someone to stop calling you, it's harassment. Why are you calling me? I don't owe them anything, not even a shoelace, so it becomes harassment.

Q. Any other reason it was harassing?

A. Pardon?

Q. Is there any other reason that it was harassing?

A. The calls?

Q. Yes.

A. The calls themselves are harassing. They're stressful. It's anxiety.

Q. I'm not asking about the effect but the calls

themselves.
A. Are harassing.
Q. Right. I'm talking about this -- we'll get to them. I'm talking about this May 3rd, 2024 call. Do you have any further detail about how it was harassing other than what you've already explained?
A. No.
Q. Okay.
A. I can't remember anything else at this point.
Q. Can you describe how this call was deceptive, this May 3rd, 2024 call?
A. No.
Q. Can you describe any other reason you're suing the defendants because of the May 3rd, 2024 call?
A. Amongst the other calls.
Q. We'll get to the calls as a group. Any other reason you're suing defendants for this specific call?
A. It was on what page, 4? No.
Q. Do you have any documentation of this May 3rd, 2024 call?
A. My call logs.
Q. The call logs that --
A. From my phone verification.
Q. Sure. I just want to make sure. The call

logs that were attached to your motion to compel; is that correct?
A. Yes.
Q. Okay. I just want to make sure we're referencing the same thing.
Okay. You can go to paragraph 20 of that exhibit. It alleges a May 5th, 2024 call at 10:44 a.m. Ms. King, can you describe the call from this date --
A. No.
Q. -- in any further detail?
A. No.
Q. Let me get the whole question out.
A. Okay.
Q. Can you describe the call in any further detail other than what's in your paragraph 20 of your Complaint?
A. No.
Q. How did you know the caller was Midland Credit?
A. It showed up on my phone.
Q. As Midland Credit?
A. Yes.
Q. And not Encore?
A. Not Encore.

Q. Not Midland Funding?
A. Not Midland Funding.
Q. Can you describe how this call from May 5th, 2024 was harassing?
A. The fact that they called me.
Q. Any other reason?
A. No.
Q. Okay. Can you describe how this call was deceptive, this May 5th, 2024 call?
A. I don't remember stating that it was a deceptive call, so it's sort of -- I don't remember stating that it was a deceptive call.
Q. So as you sit here, you don't -- you can't describe how the call was deceptive?
A. I didn't say it was deceptive.
Q. Okay. Can you describe any other reason you're suing the defendants because of this May 5th, 2024 call?
A. Everything that's in my lawsuit. I've already explained.
Q. Any other reason besides that?
A. Yeah, the violations that they've -- violations. I got so many calls.
Q. Any other reason besides that?

A. The violations. That's it.
Q. Okay. Do you have any documentation of this May 5th, 2024 call?
A. I have the same information for each and every call on the log.
Q. Okay.
A. I have the same information.
Q. I think we can -- if we want to wrap up that issue for all these, let me specify. Your documentation for all the calls, if you look -- more broadly, your documentation for all the calls that you're alleging and specifically --
A. Right.
Q. -- specifically including your allegations from paragraph 18 through paragraph --
A. Right but --
Q. Let me finish my question.
A. I'm sorry.
Q. The documentation of the calls you're alleging in this case is the call log that was attached to your motion to compel; is that correct?
A. That's a part of it, yes.
Q. What's the other part?
A. They have violations against me when they

made these calls and they're here, violations for ICAA, violation of Illinois Collection Agency Act, violation of Fair Credit Reporting Act. They're all here.
Q. I think you're misunderstanding my question.
A. Okay.
Q. You said --
A. Sometimes -- like I said, I had a stroke, so I have to process it.
Q. Sure.
A. I'm good at digging stuff but sometimes it takes --
Q. Sure.
A. -- so.
Q. We've been going through the calls one by one. You had said for the May 5th, 2024 call that your documentation, because I asked you what the documentation was for the call, and you said it's your call log that you already produced. It is for all the calls. I just want to wrap that up as a group if we can.
A. Regarding these calls that we just spoke to?
Q. Well, for all of them. If it is your -- if the answer is your documentation for all the calls you're talking about in this case is your call log that you produced that's attached to the motion to compel --

A. Yes. For these particular calls that we just referred to, yes.
Q. Okay. I think we're going to have to keep going.
All right. If you could look at paragraph 21. It alleges a May 5th, 2024 call from 12:37 p.m. Do you see that, paragraph 21.
A. May 21st?
Q. Paragraph 21, May 5th.
A. Oh, paragraph 21.
Q. Yes.
A. Okay. What about it?
Q. The May 5th, 2024 call, it alleges 12:37 p.m. Can you describe the call from this date with any more detail than is already in the Complaint?
A. No.
Q. How do you know the caller was Midland Credit?
A. It's in my phone history. It comes up as Midland Credit and it's in my phone history.
Q. Okay. How about this for all these calls as we go through them: For all these calls is it fair to say that you're saying it was from Midland Credit because it showed up as Midland Credit in your phone --

A. Yes.
Q. -- as you described how it comes up in your phone previously?
A. Yes.
Q. For all these calls, they came up as Midland Credit; correct?
A. Yes.
Q. And for all these calls, they didn't come up as Encore?
A. That's correct.
Q. And for all these calls, they didn't come up as Midland Funding; correct?
A. I don't recall seeing any of them other than Midland Credit.
Q. Okay. That takes care of that.
Can you describe how this May 5th, 2024 call in paragraph 21 was harassing?
A. Same as previously.
Q. Same as previously.
Can you describe how it was deceptive?
A. Same as previously.
Q. Can you describe any other reason you're suing the defendants because of this call?
A. For the violations.

Q. Any other reason, any other reason not --
A. No.
Q. -- stated in your Complaint?
Okay. And the documentation for this call is your call log that you attached to the motion to compel; is that correct?
A. From my phone, right, from my phone history.
Q. Okay. If you'd look at paragraph 22. It alleges a call on May 7th, 2024 at 2:12 p.m. Do you see that?
A. I'm sorry. May 7th, okay.
Q. Yes. Can you describe the call from this date with any further degree of detail than what's in the Complaint?
A. No.
Q. We've already gone over Midland. Can you describe how this May 7th, 2024 call was harassing?
A. No.
Q. Can you describe how it was deceptive?
A. It's been harassing the same, each and every call that I received. It's the same harassing call, same violations within my lawsuit, and I never said that they were deceptive.
Q. Okay.

A. But harassing, stressful, anxiety, everything that's in my lawsuit.

Q. Okay. Can you describe any other reason you're suing the defendants because of this May 7, 2024 call?

A. For the violations that I don't owe them a debt.

Q. Any other reason?

A. No.

Q. And your documentation for this call is your phone log that you attached to the motion to compel?

A. That's attached to my phone, yes, to my phone records.

Q. I'd like you to go to paragraph 23. It describes a call from May 9th, 2024. It says: "Time not recorded." Do you have -- can you describe the call from this time not recorded on May 9th with any further specificity other than what's in the Complaint?

A. No.

Q. Can you describe how this call was harassing?

A. No.

Q. Can you describe any other reason you're suing the defendants because of this call?

A. No.

Q. Your documentation of this May 9th time not recorded, 2024 call is --
A. The same --
Q. -- the call log?
A. -- as previous calls, yes.
Q. Okay. Moving along, paragraph 24, May 9th, 2024, the same day at 10:16 a.m., for this call can you describe it in any further detail --
A. No.
Q. -- other than -- let me finish the question.
A. I'm sorry.
Q. It's fine. It's natural to want to do that. You know what I'm going to say. So I can get the question out.
Can you describe the call from May 9th, 2024 at 10:16 a.m. with any greater degree of specificity than what's in the Complaint?
A. No.
Q. Can you describe how this call was harassing?
A. Same as previous.
Q. Can you describe any other reason you're suing the defendants because of this call?
A. For the violations that they -- for the violations.

Q. As you previously described?
A. Yes, as I previously described.
Q. And your documentation for this May 9th call at 10:16 a.m. is your call log that was attached to the --
A. Yes.
Q. -- motion to compel?
A. From my phone, from my cell phone history.
Q. Okay. If you go right along to the third May 9th call as alleged, paragraph 25, May 9th, 2024 at 10:17 a.m. Can you describe the call from May 9th at 10:17 a.m. with any greater degree of specificity than what's in the Complaint?
A. No.
Q. Can you describe how this call was harassing?
A. The same as previous.
Q. Can you describe any other reason you're suing the defendants because of this call?
A. The same as previous.
Q. And your documentation of this call is the call log you produced --
A. Yes.
Q. -- in the motion to compel?
May 11th, this is paragraph 26, May 11th,

2024 at 8:59 a.m. For this May 11th call, can you describe the call from this date with any greater degree of specificity other than what's in the Complaint?

A. No.

Q. Can you describe how this call was harassing?

A. Same as previous.

Q. Can you describe any other reason you're suing the defendants because of this call?

A. Same as previous.

Q. And your documentation for this call is the call log you produced to the motion to compel?

A. Along with my phone history, yes.

Q. Okay. Paragraph 27, the May 13th, 2024 call 9:59 a.m., it says: "Talked with debt collector agent named Detra Martin." Can you describe this call with any greater degree of specificity than is alleged in the Complaint?

A. I think at this point that was the third time that I spoke with an agent and asked them to stop calling me. I refuse to pay this alleged debt.

Q. Any other details you can recall?

A. No.

Q. You said it's the third time you engaged in discussion with someone from Midland Credit?

A. I believe it was three times. I know it was two but I believe it was three. I'm certain it was two but I believe it was three. It's in my records.
Q. Have you provided those records?
A. It's in my log, yes.
Q. Okay. So you suspect that there was -- you have discussion on -- you allege a discussion on May 13th. You allege a discussion on May 2nd. You believe that there was a third discussion --
A. Yes.
Q. -- before May 2nd?
A. I don't remember the date, but I remember it being three different people that I spoke to.
Q. Okay.
A. And I remember -- the last person I remember saying this is the third time that I've asked you all to stop calling me, I refuse to pay this alleged debt.
Q. Okay.
A. I remember saying this is the third time.
Q. Okay. So you're just saying you think there were three conversations generally not that this one was the third?
A. No, actually it's more.
Q. Right. We'll get to that.

A. Yeah.
Q. Okay.
A. But I knew it was at least two. Like I said, I had a stroke before, so I have to try to remember, but I knew it was two but it was actually more than three.
Q. Okay. You've referenced it a couple times now. Without getting into too much detail, approximately when did you have a stroke?
A. Two -- well, I had one stroke in 2016. I had Bell's palsy. I'm not certain if I had a third one, but I know I had the Bell's palsy and I know I had that stroke in 2016 that I remember.
Q. Okay. I know you said you just take a little bit to process information sometimes if that's what you need.
A. Yeah, when I'm talking. I do good when I'm doing what I do, but sometimes when I'm speaking, the words don't always come to me. I forgot what they call that. It's something that goes along with having a stroke, so I know words. I know what I'm saying but it doesn't always come to the front of my mind.
Q. I see. I see.
And it's not -- just to get it out of the way, it's not impacting your answers today, is it?

A. I would hope not.
Q. Okay. So going back to this May 13th, 2024 alleged call at 9:59 a.m., can you describe the call?
A. What date are we on again?
Q. We are on -- so it's paragraph 27 of the Complaint --
A. Okay.
Q. -- the May 13th, 2024 call at 9:59 a.m.
A. Yeah. Excuse me. Let me put my sweater on. I'm getting a little cold.
Q. Sure.
(Brief pause.)
A. All right. That's better.
Q. Okay. Are you still with me with paragraph 27?
A. May 13th, yes.
Q. Ms. King, can you describe the call from this date with any further degree of specificity than is in the Complaint?
A. No, no more than what I just told you.
Q. Can you describe how this call was harassing?
A. It was harassing 'cause they had continuously been calling me.
Q. Okay. Any other reason?

A. No. Same as before.
Q. Can you describe any other reason you're suing the defendants because of this call?
A. The same as previously.
Q. And the documentation for this call is the call log that you provided in the motion to compel?
A. Yes. According to my phone records, yes.
Q. Moving to the next paragraph, paragraph 28, it alleges a May 15th, 2024 call at 12:27 p.m. Can you describe the call from this date with any further specificity than is in the Complaint?
A. Same as before.
Q. Can you describe how this call was harassing?
A. The fact that they called me is harassing.
Q. Any other reason?
A. Same violations.
Q. Can you describe any other reason you're suing the defendants because of this call?
A. No.
Q. The documentation you have for this call is the call log that you produced?
A. Yes.
Q. Okay. The next one down, May 17th, 2024 at 9:31 a.m., can you describe the call from this date with

any further specificity than what's in the Complaint?
A. No.
Q. Can you describe how this call is harassing?
A. No.
Q. Can you describe any other reason you're suing the defendants because of this call?
A. Same as before.
Q. Do you have any documentation -- Strike that.
Your documentation for this call is the call log you produced?
A. Same as before.
Q. May 19th, let's go to the next paragraph, paragraph 30, May 19th, 2024 at 1:24 p.m. Ms. King, can you describe the call from this date with any further specificity than as alleged in the Complaint?
A. No.
Q. Can you describe how this call was harassing?
A. The fact they called me. The same as before.
Q. Can you describe any other reason you're suing the defendants because of this call?
A. The same as before.
Q. And your documentation for this call is your call log that you produced?
A. Yes, that's correct.

Q. The next paragraph down, paragraph 31, it alleges a May 21st, 2024 call at 11:36 a.m. It says: "Talked with debt collector agent Henry Riceman." Ms. King, can you describe the call from this date with any further specificity as what's alleged in the Complaint?

A. No, other than the fact that each time that I spoke to a debt collector each time I said to them please stop calling me, I refuse to pay this alleged debt.

Q. Can you describe how this call was harassing?

A. The fact that they called me. The same as before.

Q. Can you describe any other reason you're suing defendants because of this call?

A. For the violations that they've committed.

Q. And the documentation for this call is the call log you provided?

A. The same as before, yes.

Q. In paragraph 32 it alleges a May 30, 2024 call at 5:25 p.m. It says: "Talked with debt collector agent Natasha Miller." Ms. King, can you describe this call with any further specificity as what's in the Complaint?

A. No. As before, with each agent I said to them I refuse to pay this alleged debt, please stop

calling me.
Q. Can you describe how this call was harassing?
A. The fact they called me and it's a violation.
Q. Can you describe any other reason you're suing the defendants because of this call?
A. No.
Q. And your documentation for this call is the call log you produced in the motion to compel?
A. That's correct.
Q. Okay. So now talking about these alleged calls as a group, as a whole, can you describe how these calls were harassing?
A. Each and every one of these calls placed to my home caused me stress, anxiety and harassment. I have a grandson, a newborn. I think in -- I don't even know how old he was but he was some months old, so when I'm babysitting my grandson and I get these calls and even though it's a missed call, it's a phone that's ringing. Then it's waking my grandson up. Then it's disturbing me. Then I have to try to see after him. Then I have to try to calm myself down because I was trying to rest while he was resting. Then I get a call. Then I get another call. And I asked them to stop calling me, why are you calling me, I refuse to pay the alleged debt. I

continued to get calls and calls and calls. It's very harassing.

Q. So it's the number of calls taking place?

A. It's the fact that they're calling me. It's no reason for them to call me because I don't owe this alleged debt.

Q. Does your grandson live with you?

A. No.

Q. But you babysit him occasionally?

A. I babysit him quite a month -- quite a lot.

Q. Okay. Did you ever relay to the defendants that you were trying to put an infant to sleep?

A. I shouldn't have to.

Q. And regarding these calls as a whole, you're not saying that these calls were deceptive; correct?

A. I don't know that you would call them deceptive. And I'm being honest. I don't know that you would call them deceptive, but sometimes when somebody calls, sometimes you just holding the phone.

Q. What do you mean by that?

A. Well, I can't really say that. If I know that you're calling me and you're not saying anything but I know your number is from a call that I received previously. So I don't know. Maybe it takes awhile.

Maybe it's that they don't answer but maybe it's like it takes a few seconds or whatever before I hear them. Maybe that's what it is. I can't say they didn't call. I mean maybe that's what it is. Maybe it just takes a few seconds sometime and then I hear somebody.

Q. Okay. So your previous answer was that you didn't -- you don't really know if you recall these -- you would characterize these calls as a whole deceptive?

A. I can't say the calls on a whole are deceptive. No, I can't make that statement.

Q. Okay. Is there any -- can you describe any other reason you're suing the defendants because of these calls as a whole?

A. Because of the violations. That's it. They call me. They harass me.

Q. Ms. King -- I can take that Complaint back. Thanks.

I show you what's been marked Defendants' Exhibit 6. It's a document entitled "Summary Level Document." It's labeled as Exhibit C to your motion to compel discovery. Ms. King, this is the call log that you're referring to in your --

A. No.

Q. No?

A. No. This is not my call log that I gave you all.

Q. What are these?

A. Pardon?

Q. What are these?

A. This is what you all responded to but it doesn't have -- I don't know what these are.

Q. It was attached to your motion to compel.

A. Yeah, I know. I understand that. That's not what I'm saying. What I'm saying is it doesn't have -- okay. So here's a number 1-866-204-3941. Who is this calling to?

Q. You're referring to Page 15? It's on the top of the document. I just want to make sure we're looking at the same thing.

A. Yeah, but they're all the same, so it doesn't matter if it's Page 14, 15 or 16. They all have numbers. They have times. It doesn't have -- how does that correlate to my phone number?

Q. Well, I'll tell you, Ms. King, these are not any of the Defendants' records.

A. What?

Q. These are not any of the Defendants' records. These look like cell phone screenshots of the call

screen.
A. But --
Q. You attached them to the motion to compel. They're not my clients' records. You didn't get these documents from us.
A. Yeah, but I'm saying -- okay.
Q. That's where my confusion comes in. You occasionally refer to them as my clients' records in the motion to compel as well.
A. These came off of that -- you sent this to me off of the -- that MP3. Didn't you attach that -- oh, my God.
Q. The only data files on the compact disc we sent you --
A. But what I'm saying is you have these here. Where is my phone number?
Q. Here's -- these are not the Defendants' records. Wherever you got these you didn't get them from Midland Credit, Midland Funding or Encore. It looks like these --
A. These are the ones that I -- that you sent me.
Q. We didn't send you these, Ms. King.
A. Maybe it's off of -- maybe I printed it out.

Q. Okay. That's what I'd like to clear up. These look like cell phone screenshots that you could then save and print out as you want. If I had to guess, I would say it's your cell phone screenshot which makes sense because the cell phone doesn't have -- it wouldn't list your own number. It wouldn't list the cell phone's number. It would list the calling number. So to me these look like your cell phone's own records. Is that accurate?

A. I don't know how I did that. Okay. I don't know what I did with this. I'm not certain. I'm not certain. I have to go -- I don't know what I did with -- I don't know what I did. I have to look back at my stuff. I don't -- I think I -- I'm not -- I'm not certain what I did because I have to look at this again.

Q. Okay.

A. Could I look at my phone to --

Q. Go ahead.

(Brief pause.)

A. I'm just looking. I'm not trying to do anything over here.

Q. No.

A. Let me keep this up here. I don't want you to think I'm trying to do anything.

Give me a second.

(Brief pause.)

All right. I don't know. I don't know what I did. I thought this was something else. I don't know what I did, so I have to go back to my stuff because I really -- you're saying this is my --

Q. That's what it looks like to me. It looks like -- well, it certainly looks like a screenshot from a cellular phone, and the only way -- the only reason I think you'd be attaching that to documents is if they were screenshots from your phone.

A. I know. I know. I know.

Q. As you sit here, you can't confirm that?

A. What?

Q. As you sit here, you can't confirm that?

A. I can't do anything right now. I can't confirm this right now.

Q. Okay.

A. I know that -- I just need to --

Q. Okay. Let me do this then, Ms. King. Those were not attached or provided in discovery. We saw those for the first time attached to your motion to compel.

A. Right.

Q. If they are, if you go back and you --

A. Look at my stuff.
Q. -- look at your phone, look at your stuff and you realize that these are, in fact, screenshots from your cell phone showing the call screen and that's why --
A. Yes.
Q. -- that's how they got in this case --
A. Yes.
Q. -- if you confirm that, would you agree that those would need to be produced to me in discovery?
A. All right. Say that one more time for me.
Q. If you do confirm that these are, in fact, screenshots from your cell phone that you're relying on in this case --
A. Right.
Q. -- to show calls made, would you agree that those would need to be produced to me in discovery?
A. If I can, in fact, verify that they are the numbers that I provided, yes --
Q. Okay.
A. -- that they need to be. I just need to verify. I don't know what I did. Jesus.
Q. Okay.
A. Okay. I gotta get -- okay. Can I keep -- no. I have mine at the house. I just gotta look at it

and see what I did. Oh, Jesus.
Q. You can keep that if you want. It's a public document. You filed it.
A. I know. I know. I know I did. I know I did. If so, then I will provide that for you, yes.
Q. Ms. King, regarding the calls, are the calls that we went over from your Complaint, each of those paragraphs, each of those dates, the calls, are those the -- are those the calls on which you're basing your claims?
A. If that's everything within the call log that I sent you, yes.
Q. Well, again, the only thing I got from you --
A. Right.
Q. I sent you -- I sent you -- I need to make sure we're on the same page here.
A. Yes.
Q. I sent you a call log of Midland Credit's records --
A. Right.
Q. -- like their call log --
A. Right.
Q. -- their business record call log. I didn't get anything from you in discovery regarding a call log.

What I got was what you just put in your bag.
A. Yeah, no, you got something else too though. You got the original. I'll make certain that you have -- you should have it because I know I gave you that previously. There's a -- okay. I'll make certain if you don't have it, but I'm pretty sure you will once I get home and get -- go through my paper and I'll look to see to make certain that you had it. If not, I'll reach out to you.
Q. Okay. That sounds great.
A. Is that fair enough?
Q. That sounds great.
A. Okay.
Q. That sounds great.
As you sit here, are there, other than what we just went over, each of those paragraphs, are there any other calls that you're alleging?
A. I don't know if -- I can't say for certain. I can't say for certain.
Q. Okay. If you had documentation, your own records of the calls --
A. Right.
Q. -- would they be anywhere else but on your phone?

A. No.

Q. Okay. Ms. King, I'd like to switch gears a little bit and talk about your claims about credit information and credit reporting. Can you describe your claims about credit information against the defendants?

A. You all reached out to the credit bureaus and it lowered my credit score. It's only way I could say it.

Q. How did it lower your credit score?

A. Because that's an alleged debt for that amount that's on my credit that you all are reaching out, that Midland Credit is reaching out for, so that's lowering my credit score.

Q. Are there any other claims you're bringing against the defendants that involve your credit information or credit reporting?

A. It's only about that one claim that you all allege that I owe.

Q. So it's reporting the account? It's the reporting of Ms. King owes this account?

A. I'm sorry?

Q. It's the reporting of Ms. King owes this account to the credit bureaus?

A. Whatever you have there.

Q. Okay. Any other claims that you're making about your credit information?
A. No.
Q. Okay. Can you describe why you don't think Midland Credit owns the account in this case?
A. You have not provided me with the master agreement, with the bill of sale. I don't see anything on there with my name. Where is it that I have a -- where is it that that is my account?
Q. Any other reason?
A. No.
Q. Okay. Let's look at the bill of sale. I'm handing you what's been labeled Defendants' Exhibit 7.
A. Right. So who is this person?
Q. Wait. Let me ask a question, Ms. King.
Okay. This is a document entitled Bill of Sale and Assignment Bates stamped MCM 9 through MCM 12. Ms. King, if you could go to the second paragraph, second paragraph four lines down after it says "Agreement." Are you there?
A. Um-hum.
Q. It says: "Bank does hereby transfer, sell, assign, convey, grant, bargain, set over and deliver to buyer and to buyer's successors and assigns the account

summarized on the asset scale," excuse me, "asset schedule attached hereto as Exhibit A and included in the final electronic file." Did I read that correctly? Did I read that correctly?

A. I'm reading. I'm listening to what you're reading but my question is --

Q. Well, did I read that correctly?

A. What it says here?

Q. Yes.

A. Read it again, please.

Q. Sure. "Bank does hereby transfer, sell, assign, convey, grant, bargain and set over and deliver to buyer and to buyer's successors and assigns the accounts summarized on the asset schedule attached hereto as Exhibit A and included in the final electronic file." Did I read that correctly?

A. Um-hum, yes.

Q. Please turn to MCM 10, the next page. It says: "Exhibit A to Bill of Sale," and it says in the boxed area Lot -- under the column "Lot Citi Retail Services DNC Bulk June 2021 (Macy's)." Did I read that correctly?

A. Citi '21, yes.

Q. Ms. King, do you have any reason to believe

that this assignment was ineffective?
A. Yes.
Q. Why is that?
A. Who is this -- whose signature is this at the bottom? National Store Bank, whose signature is that? Because I don't know these people. How do I know --
Q. You dispute the assignment -- if I'm understanding you correctly, you dispute the assignment because you don't know the individuals who are signing --
A. What I'm saying is are -- is this the person that you're saying I signed something with when I signed it originally? Is that what you're saying? You're saying that -- okay. You're saying that this is from Macy's. If I had an account with Macy's, wouldn't you have to have the document where I signed the application with Macy's?
Q. Let me ask the questions, Ms. King.
You would need -- you're disputing it because you don't have a contract with your signature on it; is that correct?
A. Yes.
Q. Okay. And because you're not familiar with the signatories to the Bill of Sale and Assignment; correct?

A. Yes.
Q. Okay.
A. Because this looks like the same person, so they're with CitiBank Department, signature authorized for everything.
Q. Let's go to a different document, Ms. King.
A. Yeah.
Q. I'm showing you what's marked Defendants' Exhibit 8. It's a document entitled Department Stores National Bank Credit Card Agreement Bates stamped MCM 13 through MCM 24. Ms. King, is this the Terms and Conditions for your Macy's credit card account?
A. I can't verify this. I can't verify this. I can't.
Q. Could you explain how Midland Credit would have this document if it wasn't assigned the account?
A. That's what I want to know.
Q. Well, no. Can --
A. How would you all -- I don't -- I don't know. Let me put it that way. I don't know.
Q. Okay. I can take that back.
A. All right.
Q. Thank you.
I show you what's been marked as Defendants'

Exhibit 9 Bates stamped MCM 25. It reads at the bottom: "Account information provided by Department Stores National Bank pursuant to the Bill of Sale/Assignment of Accounts transferred on or about 6-29 2021 in connection with the sale of accounts from Department Stores National Bank to Midland Credit Management, Inc." Ms. King, I want to go through a couple of these items here. It says, at the top of the list, it says: "First name Brendalyn, middle name J, last name King." That's your name; correct?

A. Yes.

Q. Social Security number, the first five numbers are xed out and the last four are [redacted]. Those are the last four digits of your Social Security number; correct?

A. Yes.

Q. It lists your date of birth as [redacted], 1950; is that correct?

A. Yes.

Q. And that is your date of birth?

A. Yes.

Q. It lists your address as 18834 Loomis Avenue in Homewood, Illinois, 60430. That was your prior address; correct?

A. Yes.
Q. It says at the bottom "Affinity Macy's;" is that correct?
A. Yes.
Q. Ms. King, can you explain how Midland Credit would have this information if they weren't assigned the account?
A. I don't know.
Q. Hypothetically if -- if hypothetically Midland Credit owned this account, would they be able to access your credit report?
A. I don't know.
Q. I'm not asking you about anything on that document.
Are creditors generally allowed to access credit reports for their customers?
A. I don't know.
Q. Do you have a mortgage? No, you rent.
Did you give your landlord access to your credit report?
A. Pardon?
Q. Did you give your landlord access to your credit report?
A. I don't recall.

Q. Have you ever taken out a car loan?
A. Yes.
Q. Did they access your credit report?
A. I don't recall. It's been -- my car's paid off. I don't remember. It's been awhile. I don't know.
Q. You said you did have credit cards; correct?
A. Pardon?
Q. You said you have had credit cards before; yes?
A. Yes.
Q. Do they report to the credit bureaus?
A. I don't know what they did. I just had a card.
Q. I can take that back.
A. Okay.
Q. Ms. King, can you describe your claims against the defendants under the Telephone Communication Protection Act?
A. Pardon?
Q. Can you describe your claims against the defendants under the Telephone Communication Protection Act?
A. My memory is not like that. I can't --
Q. I see.

A. -- spit it out. I have stuff that I have to read. I don't --

Q. Okay. Let's do this. I'm showing you a copy of what's been marked Defendants' Exhibit 10. It's the file stamped copy of your First Amended Complaint. The file stamp is July 2nd, 2025 in this case, 25-cv-3293. Ms. King, if you turn to Page 7. Do you see that signature block at the bottom of the page dated July 2nd, 2025?

A. Yes.

Q. Under that there's a signature. Is that your signature?

A. Yes.

Q. Okay. You drafted this Complaint --

A. Yes.

Q. -- the First Amended Complaint?

Did you have any help?

A. No.

Q. Ms. King, if you turn to Page 4. Are you there?

A. Yes.

Q. Okay. Looking at Count IV, "Violation of the TCPA," paragraph 41 it alleges: "Defendants used an automatic telephone dialing system (autodialer) to

contact plaintiff's cell phone without her prior expressed consent, in violation of 47 U.S.C. Section 227 (b)(1)(A)(iii)." Do you see that?

A. Yes.

Q. Ms. King, what makes you think that defendants used an autodialer to contact you on your telephone?

A. Because when I pick up my phone, I don't hear anyone immediately.

Q. Is there any other reason?

A. No. It's like it's a delay and then I hear someone.

Q. Do you have any documents to support your claims?

A. No.

Q. Are you basing your TCPA claims on anything else?

A. No.

Q. I can take that back.

Ms. King, can you describe your claims against Encore individually?

A. Encore is the parent group of Midland Credit and Midland Funding, so Encore is supposed to know what's going on with Midland Funding and Midland Credit, so

they're responsible as much.

Q. What are you basing that on?

A. That they're the parent group.

Q. So it's just based on corporate relationship?

A. Yes.

Q. Okay. What about their relationship makes your claims appropriate against Encore?

A. I'm sorry. Repeat that.

Q. What about the relationship between Encore and Midland Credit makes your claims appropriate against Encore?

A. Because Midland Credit -- Encore and Midland Funding, Midland -- Encore is the parent group. Midland Funding funds the project and Midland Credit goes after the collections, so Encore is like the parent. Like your mother and father is over you and what goes on in your house. Encore is the parent over Midland Funding and Midland Credit.

Q. My parents aren't legally liable for my actions. Why do you think Encore is?

A. I can't answer that.

Q. Is there anything else other than the corporate relationship between the three entities --

A. Yes, that's -- yes.

Q. Sorry. Let me get the question out.
A. I'm sorry.
Q. It's okay. Is there anything else other than -- it's fine. Is there anything else other than the corporate relationship that you're basing your claims against Encore on?
A. Nothing. That's it.
Q. And to specify, Encore never contacted you directly; correct?
A. No.
Q. Did you ever contact Encore directly?
A. No.
Q. Okay. Would everything about our previous discussion also apply the same way to Midland Funding?
A. What do you mean?
Q. Okay. Let me try it this way: Can you describe your claims against Midland Funding individually?
A. Midland Funding is -- I can't explain it. Like Midland Funding funds the money to purchase the debts. Midland Credit goes after them.
Q. So are you basing your claims against Midland Funding on its corporate relationship with Midland Credit?

A. Yes.
Q. What about their relationship makes your claims against Midland Funding appropriate?
A. Because they're part of the family group, Encore, Midland Funding and Midland Credit.
Q. Do you think Midland Funding has the ability to control Midland Credit's actions?
A. I can't answer that.
Q. Is there anything else aside from the corporate relationship structure that you're basing your claims against Midland Funding on?
A. No.
Q. And Midland Funding never contacted you directly; correct?
A. That's correct.
Q. And you never contacted Midland Funding directly; is that correct?
A. That's correct.
Q. Are there any other facts other than what we've discussed this morning and afternoon on which you're basing your claims against the defendants?
A. No.
Q. What are you claiming for damages against the defendants?

A. It's in my record. It's in the Complaint.

Q. Let me go back to Exhibit 11 that you've already gone over. These are Exhibit 11, Plaintiff Brendalyn King's Responses to Defendant Midland Credit Management, LLC's First Set of Interrogatories.

A. Right.

Q. Ms. King, are the responses you gave to these interrogatories accurate and complete to the best of your knowledge?

A. Yes, sir.

Q. Okay. I would like you to turn to Page 13. Please let me know when you're there.

A. I'm there.

Q. Your response to interrogatory number 13, about halfway down it says: "As a result of Defendants' conduct, plaintiff experienced," and there are six bullet points. The first one says: "Stress and anxiety caused by repeated and unsolicited phone calls." Can you describe this bullet point with any further detail other than what's said in the response to the interrogatory?

A. I don't know how to explain stress and anxiety to you. Nervousness, stressful. I don't know how to explain stress to you, sir, but it's not a good feeling. If I'm stressful, then -- you know, I had my

grandson and I'm trying to relax with him. I can't because -- and I'm telling you to sit down but you want to read a book right now but I need to go take a few minutes to nana and then we'll read a book. I'm stressed out. He want to go outside. I want to stay inside because I'm stressed out because I keep getting calls for alleged debt that I don't owe.

Q. Anything further regarding stress and anxiety?

A. Yeah, I don't know what else to -- I don't know how to explain stress and anxiety. For everybody it's different. What it does to me --

Q. Just for you.

A. Yeah.

Q. So there's nothing further? I want to go through these so we can --

A. Stress and anxiety.

Q. Other than what you've just said nothing further?

A. No.

Q. Okay. The second bullet point is: "Frustration and emotional upset from being contacted regarding a debt she disputes." Is there any further detail --

A. No.
Q. -- about frustration and emotional upset?
A. No.
Q. The third bullet point: "Distress related to Defendants' continued reporting of the alleged account under credit reports." Anything further with distress other than what's --
A. No.
Q. -- said in that bullet point?
The fourth bullet point: "Concern regarding damage to her personal financial reputation." Anything further regarding concern other than what's already been said?
A. No.
Q. The fifth bullet point: "Time and inconvenience spent reviewing credit reports, drafting correspondence, maintaining e-mail call logs and preparing Complaints." Anything in the time and inconvenience in this bullet point other than what's written?
A. No.
Q. The last one: "Emotional strain associated with ongoing litigation." Anything from that sixth bullet point that isn't already stated?

A. No.
Q. And if you could turn to Page 14, please. Are you there?
A. Yeah. I'm sorry. Yes.
Q. That's fine. At the top of Page 14 it says: "Plaintiff has not claimed medical treatment for emotional distress at this time." Is that still the case?
A. Yes.
Q. Are there any other damages that you're claiming in this case?
A. No.
Q. I can take that back, Ms. King.
So I want to circle back about your call logs, if there's going to be any call logs you're going to be producing in this case. If you go through your phone again, just, you know, regroup and recollect your thoughts about what these -- what were they? It's Exhibit --
A. 6.
Q. Yes. So if you can -- if you confirm that Exhibit 6 is some sort of -- are records from your phone or data from your phone that is a screenshot, you're going to reach out to me?

A. Yes, absolutely.
Q. Okay.
A. I'll make sure if -- I just have to go back through my stuff. I've got papers everywhere. Once I do that if it is, then I'll get back to you.
MR. MANETTI: That is all I have, Ms. King.
THE WITNESS: Thank you for your time.
MR. MANETTI: Thank you for coming here.

STATE OF ILLINOIS)
                 )  SS:
COUNTY OF C O O K)

I, KELLY A. BRICHETTO, a Certified Shorthand Reporter of said state, do hereby certify that the within named witness, BRENDALYN KING, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by the above-referenced witness was by me reduced to stenotype in the presence of said witness; afterwards transcribed, and that the foregoing is a true and correct transcription of the testimony so given by the above-referenced witness.

I do further certify that this deposition was taken at the time and place in the foregoing caption specified and was completed without adjournment.

I do further certify that I am not a relative, counsel or attorney for either party or otherwise interested in the event of this action.

IN WITNESS WHEREOF, I do hereunto set my hand this 15th day of April, 2026.



KELLY A. BRICHETTO
CSR License No. 84-3252